Common Pleas Court of Trumbull County.

OHIO WATER SERVICE CO. V. HARRY NEWMAN, ET AL.

Decided June 3, 1933.

*Donald J. Lynn* and *Robert D. Huxley,* for plaintiff.
*Frank Cowdery,* for defendant, Harry Newman.

CARTER, J.

This is a proceeding instituted by the plaintiff against the defendants, in which the plaintiff is seeking a perpetual injunction restraining the defendants and each of them from trespassing upon the lands described in the petition, including the easterly one-half of the Niles Vienna road located along the northerly and westerly portion thereof for the purposes of fishing, catching and killing fish in any waters thereon, whether such waters are upon plaintiff's lands lying within the confines of the public highway or

otherwise. The basis of this claim for injunction is set out in the petition, the pertinent allegations being as follows:

Plaintiff alleges that it is a corporation organized and existing under and by virtue of the law of the state of Ohio, and that it is the owner in fee simple of the following described lands; in which two parcels are described; and claims that the above described lands, together with other lands lying southerly and westerly thereof were acquired by it in 1929 and 1930 for the purpose of constructing thereon a reservoir or pond by the damming of the waters of Squaw creek flowing there-through; and that this plaintiff had before acquired approximately 550 acres of land in this vicinity and that the reservoir or pond which it has constructed thereon covers approximately 200 acres of land; and further claims that after said reservoir was constructed and during the years 1931 and 1932 it proceeded, at great expense to itself, to stock these waters with fish of various kinds, which it transported to said waters and then and there released, approximately 150,000 fish; and claims that these fish when released were small, and that it is the purpose of the plaintiff eventually to open up said waters for public fishing when and as such fish become sufficiently numerous and a proper size; and that it has at no time since the stocking of these waters permitted any person to fish therein; but on the contrary has set aside the same for the production, propagation and protection of fish and other wild life; and further that the said line of the Niles-Vienna road constitutes the easterly and northerly property lines of the plaintiff, and that such road is approximately 50 feet in width; that part of the land within said highway limits is inundated by the waters of this reservoir. However, claims that it does not in any way interfere with the traveled portion of the highway, or in any way obstruct the free passage of persons, animals or vehicles thereon and that the waters of Squaw creek flow into said reservoir or pond at a point upon the first parcel of land hereinbefore described and are bridged by a certain concrete highway bridge at said point approximately 24 feet in width and three feet above the waters thereof; that the center line of said bridge is approximately the center

line of the Niles-Vienna road; and that the waters immediately south of the southerly rail of said highway bridge are approximately 4 feet in depth during the flood periods. And further alleges that the petitioner has erected several signs along said highway in the vicinity of this reservoir warning persons against fishing and trespassing in the waters and upon its lands at this place, and that in addition thereto it has taken other means of warning persons from fishing and trespassing. And the petitioner further claims that notwithstanding these warnings, many persons have been trespassing and fishing in the waters and upon the land so owned by the petitioner in fee simple and particularly in the waters covering lands within the confines of said highway as originally laid out and dedicated to the public for general highway purposes. And especially that the public have been fishing from off the southerly rail of this highway bridge; and further claims that its predecessors in title, in dedicating to the public said Niles-Vienna road, granted only an easement of passage to and fro and did not part with any rights or privileges concerning any fish which might inhabit the waters of such creek or reservoir formed by the damning of such creek or waters, but on the contrary they reserved to themselves, their heirs and assigns, all of the privileges and rights pertaining to said premises not connected with and incidental to the right of passage; and that said rights so reserved included the right to foster and protect for its own use the fish in the waters of Squaw creek and of any other waters which might flow over or upon or across said highway and within the confines thereof; and that such rights and privileges were in no manner surrendered to the public in granting the easement and right of passage; and that the public acquired no right to kill or molest the fish inhabiting such property while they were passing to and fro across that portion of the highway owned in fee simple by the petitioners; and that the fishing for, catching and killing of fish inhabiting the waters adjacent to the waters covering the lands within said highway limits and found temporarily within the confines of said highway is in no manner connected with or incidental to the public right of passage and transportation;

And further alleges that Harry Newman, one of the defendants, has heretofore, on or about April 17, 1933, trespassed upon its said hereinbefore described lands for the purpose of fishing for, catching or killing fish in the waters thereof, and particularly within its waters contained within the confines of said highway lying south and east of the center line thereof contrary to the provisions of Section 12525, General Code.

And that the said Harry Newman was brought before the Honorable W. C. Scoville, Justice of the Peace of Vienna township, Trumbull county, under a charge of trespass, but that the Justice of the Peace declined to hear said cause on the ground of bias and prejudice; and that thereupon the said proceedings were dismissed upon the dockets of said court, and that a warrant for the arrest of the defendant, Harry Newman, was duly issued by the Honorable D. B. Harris, a Justice of the Peace of Hubbard township. That upon the trial of said cause, said defendant was found not guilty of such trespass and was acquitted contrary to the law and the evidence; and that as a result of such acquittal, defendant, Harry Newman now threatens to continue his unlawful fishing in said waters regardless of plaintiff's rights and title; that the defendants, John Doe, Richard Roe and Mary Foe, unlawfully and without right or title and without color of right or title have, during the month now past, entered upon the lands of plaintiff for the purpose of fishing for, catching and killing fish and of fishing in the waters thereon, including the waters within the confines of the highway, disregarding said warning notices and utterly unmindful of plaintiff's rights, and now threaten to continue their fishing, and that plaintiff cannot obtain adequate remedy at law for the wanton violation of its rights; that because of the great number of persons fishing upon said plaintiff's lands off and on said highway, plaintiff is subjected to a multiplicity of suits to enforce an observance of its legal rights and in equity and good conscience ought not and should not be compelled to seek relief by a constant succession of arrests in the light of its experience in the courts of said justice of the peace. And that plaintiff will sustain a great and irreparable loss and

injury in the destruction of fish which it is endeavoring to protect, preserve and propagate in said waters; and that such fishing prevents the free use of the enjoyment by plaintiff of its said waters and the fish and essentially interferes with its comfortable enjoyment of its lands and waters; and that the continuance of said fishing will cause a multiplicity of suits and continued and repeated litigation. And that the taking by the defendant of plaintiff's fish upon a public highway in areas not obstructing the public travel thereon is a taking of private property for private uses without compensation and that such fishing constitutes a confiscation of private property without due process of law and is a denial of the equal protection guaranteed by the fourteenth amendment to the Constitution of the United States.

Now these are the material allegations of the petitioner as set out in its petition.

To this petition an answer has been filed containing a number of claimed defenses, among them being the following.

Comes Harry Newman and answering the allegations contained in the petition of the plaintiff asks for strict proof of the same and denies each and every allegation and assertion contained in the petition, and specifically denies the existence of a corporation empowered by charter to transact any fish hatchery or for the propagation of fish or game or wild life as stated; and says that the said plaintiff, as an artificial person, is only empowered to do business according to law as a water company and is chartered and empowered for that purpose and for none other.

With this defense I am not interested, for if The Ohio Water Service Company is exceeding the purpose of its organization, *quo warranto* is the proper remedy to pursue and would be no defense to the claims made by the petitioner.

And it is further claimed that the waters in said Squaw creek as impounded by plaintiff are not owned by them and if such waters are not owned by the plaintiff, it cannot commercialize or sell the same or any fish that may be therein; the fish belong to the public at large; neither can plaintiff

acquire exclusive fishery rights therein, Squaw creek being a natural water course going into the Mahoning river beyond the memory of man; that Squaw creek flows into the basin of plaintiff and flows out at the foot of the lake over its spillway. And claims that the said road and bridge is a public thoroughfare, designated and used for over 100 years by the public in travel and fishing off and on said road; and says that it is not true that the plaintiff owns as stated a fee simple title to the center of the Niles-Vienna road and in the said bridge mentioned in the petition, but that if the plaintiff has anything in exclusive fishery or fishing rights in the reservoir impounded by it, it is bounded by its proper water rights and cannot extend into the public highway until flooded by rightful authority of law and the consent of the public road authorities; and that if the plaintiff has anything, it is in common with the public and no greater than that of the public and not exclusive of the public in general, denies that the company expects to open up the reservoir for public fishing in the future, but claims that it is their expectation to have and maintain in said basin exclusive fishery rights for its stockholders and officers and friends; and admits that it is true that various persons fish in said pond by buying from said plaintiff the privilege. And further claims that it is not necessary to purchase from plaintiff the right to fish on the roadway or in the said roadway, as the rights of the plaintiff are subject to all legal highways.

Claims that the public and the fishermen of the state are entitled to have the use of the natural flow of this stream for fishing, navigation or any purpose for which streams of water naturally give resources to the public.

And the defendant denies that he on April 13, 1933, trespassed upon the private enclosed lands of the plaintiff for any purpose contrary to Section 12525, General Code of Ohio; and says that he was unlawfully and without probable cause falsely and maliciously arrested by agents of the plaintiff while upon the said bridge or said highway, and was unlawfully transported to a Squire's office in Vienna township where he was without trial discharged from custody.

And that again he was unlawfully caused to be arrested and taken before Squire D. B. Harris of Hubbard township where at great expense he was tried and acquitted in said court.

And prays that the petition be dismissed at plaintiff's costs and that all rights that the public have herein may be preserved in the use of said highway and streams afore-said.

This cause came on to be heard on the application of the plaintiff for a temporary restraining order pending hearing on its merits, at which time the court refused to grant a such restraining order and ordered that the case be set down for trial on its merits, which was agreed to by counsel representing all parties in interest.

Later on, the cause came on for hearing in which a large amount of testimony was submitted, and the material allegations of the petition were established. Among the material allegations of the petition established was that the defendant Harry Newman had done some fishing on the highway south of the central thread of the highway; that a large number of the general public had been resorting to the same place for the purpose of fishing and had caught a large number of fish in the waters south of the central thread of the highway, being as claimed by the petitioner on lands in which the title was vested in it.

The issues confronting the court for determination are these:

"First: If the petitioner owns to the center of the highway, which the deed indicates it does, what are the rights of the petitioner in the highway, what are the rights of the defendant Newman, or the public in general in and over the highway in which the fee simple is vested in the Water Company subject to the highway easement?

"Second: Is injunction the remedy for the violation of the rights of this petitioner if his rights are violated particularly within the confines of the highway? Or has he other remedies which he must pursue otherwise than resorting to a court of equity by way of injunction?"

This road was established and opened to public travel back in 1807 and it has been used as such continuously from that time until the present. Now what are the rights of the

petitioner and what are the rights of the public in and to this highway? I can find no better general statement of the law defining their respective rights than found in 29 Corpus Juris, page 540, under the subject "Title to fee and rights of public and abutting owners," which is as follows:

"The general rule is that the public acquires an easement only in highways, the fee of the land remaining in the owner subject to the easement. In the absence of evidence to the contrary, title to the fee is presumed to be in the abutting land owner and this title extends to the center of the way unless the presumption is rebutted."

And in paragraph 258 the text writer uses this language:

"From the principles stated in the preceding section, it regularly follows that when the highway is discontinued or abandoned, the land becomes discharged of this servitude and the absolute title to the land covered by the highway reverts to the owner of the fee, except where the fee to the highway has passed to the public."

Paragraph 259:

"Notwithstanding the laying out of the highway and the condemnation of the land to the use of the public for travel, the title to the soil and all the profits thereof consistent with the existence of the easement remain in the original owner. The title of the owner subject only to the easement remains perfect, not only to the land covered by the highway, but to all the material within its boundaries except such as may be needed to build or maintain the road. He therefore has title to any superfluous earth, gravel or rock not necessary or useful in the construction or repair of the highway, and to all mines or quarries, trees, grass, springs of water, growing crops and pasturage upon and above the surface of the soil covered by the highway 'as long as they do not interfere with the free and full enjoyment of the public easement.'"

Paragraph 261:

"The general easement in the public, acquired by the location of a highway, extends to the limits of the highway as located and consists in the privilege of passage with the powers and privileges which are incident to such a right, such as the right to construct and maintain a safe and convenient roadway, to make sewers and drains, lay gas and water pipes, make reservoirs, and do any other acts which tend to facilitate travel and are in furtherance of the pur-

pose for which the easement was acquired. But the public have no right in a highway which is incongruous with the purpose for which it was originally created, and which at the same time is injurious to the proprietor of the soil."

And this general statement of the law has been reiterated time and again by the courts of our own state.

In the case of *Emanuel Phifer* v. *John Cox,* 21 Ohio State, page 248, the first paragraph of the syllabus is as follows:

"By the lawful establishment of a public road, the public acquires a mere easement or right of way on the land over which it passes, with the powers and privileges incident to that right; but the owner of the fee retains the exclusive right to the trees, shrubs and herbage growing on the land for all purposes not incompatible with the right of way, and he may maintain an action in respect to them when not taken for the purpose of making or repairing the road or lawfully abated as a hindrance or annoyance to travelers thereon."

And the third paragraph:

"Where a growing hedge standing within the bounds of a highway but leaving ample room for the public travel, which was not thereby incommoded or annoyed, was cut down by an individual not acting under official authority— *held,* that the hedge was not such a nuisance as would justify any person in abating it and that the owner of the fee might maintain an action for his damages sustained thereby."

In the case of *Lawrence Railroad Company* v. *Sarah Williams,* 35 Ohio State, page 168, the syllabus is as follows:

"Where a railroad occupies a public highway for its track without appropriating or otherwise acquiring the right to do so, an owner of abutting lands, having the fee in the lands covered by the highway, may proceed, under Section 21 of the act of 1872 (69 Ohio Laws 95) to compel the company to appropriate the right of way for its road."

And on page 171 the court uses this language:

"As between the public and the owner of land upon which a common highway is established, it is settled that the public has a right to improve and use the public highway in the manner and for the purposes contemplated at the time it

was established. The right to improve includes the power to grade, bridge, gravel or plank the road, in such a manner as to make it most convenient and safe for use by the public, for the purposes of travel and transportation in the customary manner, which is well understood to be by the locomotion of man or beast, and by vehicles drawn by animals, without fixed tracks or rails to which such vehicles are confined when in motion. These constitute the easement which the public acquires by appropriating land for the right of way for a highway, and these, in legal contemplation, are what the owner is to receive compensation for when his land is appropriated for this purpose. The fee of the land remains in the owner; he is taxed upon it; and when the use or easement in the public ceases, it reverts to him free from incumbrance."

In the case of *Daily, et al* v. *State,* 51 Ohio State, page 348, the syllabus is as follows:

"An owner of land adjoining a public highway whose title extends to the center of the road, who has cultivated shade trees, planted partly on his own land and partly in the line of the highway within the bounds of his deed, has a property interest in such trees, and the right to their enjoyment subject only to the convenience of public travel.

"The property right of such owner in trees thus cultivated by him, is a proper subject of legislation for its protection. And one who, having knowledge of the rights of such landowner in the trees, proceeds against the protest of such owner, heedlessly, recklessly and carelessly to injure them, may be prosecuted under Section 6880 of the Revised Statutes, for a wrongful injury to property.

"The legislature may authorize the construction of telegraph lines by a telegraph company upon a public highway, in such manner as not to incommode the public in the use of such highway, but authority so given does not empower such company to injure the property of an adjoining landowner, nor to appropriate any of his property rights in the highway except upon the condition that compensation be first made."

In the case of *Schaaf* v. *The Cleveland, Medina & Southern Railway Company, et al.,* 66 Ohio State, page 215, the syllabus is as follows:

"The construction and operation of an interurban railroad laid with T rails, entirely on the side of a public highway next to the abutting improved farms owned and occu-

pied by the plaintiffs and entirely between their lands and the traveled part of the highway, the company having authority to run an unlimited number of cars and trains for the carrying of passengers and the transportation of freight, express matter and government mail, is an additional burden on the public highway and obstruction to, and interference with the plaintiffs' easements and rights therein, not substantially different from those that are imposed by the construction and operation of steam railroads, under like conditions.

"The construction and operation of an electric plant in connection with such railway and on the same side of the traveled public roadway, for supplying heat, power and light to consumers for profit, constitutes another additional burden which is an invasion of the plaintiffs' property rights.

"The plaintiffs are entitled to injunction in such case, to prevent the construction and operation of such railroad, and of such electric plant, or either, until compensation and damages shall be assessed them in a proper appropriation proceeding, and paid or secured to be paid."

And in the course of the opinion of the court on page 230, speaking of the plaintiff, it uses this language:

"This was her private property within the meaning of the constitution, subject only to the easement of the public therein. The nature and extent of this easement was above shown. The railroad company by occupying the highway, constructing its track, and operating its trains thereon by steam motive power completely diverted the highway from the uses and purposes for which it was established.

"This new use to which the highway has been diverted imposes burdens on the land that are entirely different from, and in addition to, those that were imposed by the highway. The right to so divert the use, and impose additional burdens on the land, could only be acquired by the corporation by agreement with the owner, or by appropriating and making compensation therefor, in the mode prescribed by law."

And the court further said:

"We are aware that decisions in other states may be found which do not entirely agree with ours; but the Ohio rule above announced has been established for many years, going back to *Crawford* v. *Delaware*, 7 Ohio State, 459, and has never been departed from. We are entirely satisfied with it."

In the case of *Ohio Bell Telephone Company* v. *Watson Company*, 112 Ohio State 385, the syllabus is as follows:

"In this state the fee to the country highway is in the abutting owner, and the public has only the right of improvement thereof and uninterrupted travel thereover.

"The owner of land abutting upon a country highway, whose title extends to the center of the road along the side of which are located shade trees, has a property right in such trees, and the same may not be interfered with unless by consent of such owner or first making compensation according to law.

"The erection and maintenance of telephone poles and wires within the limits of a country highway is an additional burden upon the easement and an invasion of the property rights of the abutting owner for which he is entitled to compensation.

"Where along a rural highway a telephone company has erected poles, done necessary cutting and trimming of a shade tree to permit the placing of telephone cables on said poles, such construction, however, not interfering with the access, light and air of the owner, but being without the consent and against the protest of such owner, an injunction will be granted at his instance restraining the further construction of such telephone line and requiring the removal of the poles and cables already in place, unless compensation shall be made to such owner or his consent obtained."

And on page 389 the court uses this language:

"The fee to streets within municipalities in Ohio rests in trust in the municipality for street purposes, subject to the abutting owner's rights to ingress and egress, light and air. On the other hand, outside the limits of a municipality, the fee to the land in the rural highway rests in the abutting landowner, subject only to such rights as are incident to and necessary for public passage, in other words, the right of the public to improvement, maintenance and uninterrupted travel; the abutting owner having all right to all uses of the land not inconsistent with such right of improvement and travel.

"Whatever may be the rule in other states, we have supposed that the question of the right in the highway of a landowner whose title extends to the center of the road is not an open one in Ohio. The question has been the subject of adjudication in a score of cases decided by this court."

So in reviewing these Ohio cases, it is clear that the general law as laid down *supra* with reference to the rights of abutting property owners and the rights of the general public in the highway where the abutting property owner's title extends to the center of the road has been followed religiously in Ohio, and is not an open question.

Further, Swan's Treatise, 22nd Edition, page 814:

"A person is deemed in actual possession of a highway which runs over his lands and may maintain trespass against another for any use of the road except for traveling, as for cutting timber, digging in the soil, etc. The public acquire the mere right of using the road for traveling and the purposes incident to traveling, and every other right belongs to the owner as exclusively as if the highway never existed."

And Judge Swan cites a number of authorities, 37 Cyc. 203:

"Notwithstanding the laying out of a highway and the condemnation of the land to the use of the public for travel, the title to the soil and all the profits thereof consistent with the existence of the easement remain in the original owner. The title of the owner, subject only to the easement, remains perfect, not only to the land covered by the highway, but to all the material within its boundaries, except such as may be needed to build or maintain the road. He therefore has title to any superfluous earth, gravel or rock not necessary or useful to the construction or repair of the highway, and to all mines or quarries, trees, grass, springs of water, growing crops and pasturage upon and above the surface of the soil covered by the highway."

And further says:

"The public has no right along a highway which is incongruous with the purpose for which it was originally created and which at the same time is injurious to the proprietor of the soil. The common law guards with jealous care the rights of the owner of the servient estate in a suburban road against encroachments by individuals and holds them very strictly to the use of the road for the purpose of passing and repassing."

Quoting from Elliott on Roads and Streets, volume 1, fourth edition, page 562:

"Travelers upon the public highway have the right to do all acts reasonably incident to a viatic use of the way.

"70 Atlantic 385, viatic is defined as 'pertaining to a journey or travel.' "

And in one of the older cases as reported in the 104 Northwestern 97:

"Where defendant caused his cattle to be driven to a highway ditch in front of plaintiff's premises, and on plaintiff's side of the highway, to drink water flowing therein, and the cattle tramped down the banks of the ditch, causing the water to spread out and disturb the outlet of plaintiff's private ditch leading from the plaintiff's land into the highway ditch, such act was not a proper use of the highway and constituted a trespass.

"The owner of a fee on a highway may maintain trespass against anyone who makes an unreasonable use of the same, as for example by placing obstructions thereon and imposing additional servitude thereon without the permission of the owner.

"Thus it is trespass on the part of a municipal corporation to remove earth from one street in order to make a fill in another one unless it is taken to improve the former.

"Likewise, an action of Trespass *Quare Clausum fregit* may be maintained against persons who put their cattle into the highway to graze. It is also a trespass to erect a telegraph pole in a private alley without permission. It is unreasonable use of a sidewalk to remain there and use abusive language toward the owner and refuse to depart. Hence trespass lies for such conduct."

And on page 942:

"Any wrongful intrusion of the right to use land for hunting or fishing is clearly a trespass regardless of the amount of damage caused by such invasion."

*Lembeck* v. *Neys*, 47 O. S. 336:

"A non-navigable inland lake is the subject of private ownership and where it is so owned, neither the public, nor an owner of adjacent lands, whose title extends only to the margin thereof, have a right to boat upon, or to take fish from its waters."

And in the case of *The East Bay Sporting Club* v. *Miller, et al.,* 118 Ohio State 360-364:

"It is also the law of Ohio that the ownership of land under the waters of non-navigable marshes, ponds, rivers, lakes and creeks carries with it the exclusive right of hunting and fishing and all other property rights."

Citing a long array of authorities. And in that case the court held that the defendants and those claiming under them should have been enjoined from trespassing upon the premises of plaintiff or fishing upon the waters of Black Channel and Plum Brook, eastward from the mouth of Black Channel.

In the case of *Realty Company* v. *Johnson,* 66 L. R. A. 439:

"The owner of the soil has exclusive dominion over it and the exclusive privilege of hunting, including the unqualified right to control and protect the wild game thereon. In granting an easement across his premises for the purpose of a public highway, the owner does not surrender to the public his right to foster and protect wild game upon the land and the public does not acquire any right to pursue and kill the same while it is temporarily passing to and fro across the highway."

Further on the court held that

"It necessarily follows that, in dedicating the highway in question to the public, respondent reserved to itself all the other privileges and rights pertaining to the premises, which included the right to foster and protect, for its own use, wild game thereon, and that such right and privilege were in no manner surrendered to the public in granting the easement. It also follows that the public, including the appellant, in accepting the easement thus granted, acquired no right to kill or molest the game inhabiting the property while it was passing to and fro across the highway.

"The right to fish and fowl is a part of the soil, and cannot be acquired except by grant, and does not exist in a highway easement."

In an old English case, *Regine* v. *Pratt,* 4 E. L.—B. L. 860, 24 L. S. M. C. 113:

"A man passing along the road set his dog onto private property adjoining the road. The dog flushed a pheasant. The man shot at it as it flew across the road, and it was held that he was liable as a trespasser."

Lord Campbell said:

"Pratt being on the land was undoubtedly a trespasser if he went there not in the exercise of a right of way but for the purpose of seeking game. And I take it as clear, said Lord

Campbell, that if a man uses the land over which there is a right of way for any purpose lawful or unlawful other than the passing or repassing, he is a trespasser."

And a very similar doctrine was laid down in an American case and the court in its opinion asserted that a man would have no right to play a tune or sing a song on the highway in front of the premises of the owner of a servient estate.

"The public have no need of the highway but to pass and repass. If it is used for any other purpose not justified by law the owners of the adjoining lands are remitted to the same rights they possessed before the highway was made. They can protect themselves against such annoyance by treating the intruders as trespassers."

So that it seems quite clear from the above citations that one may be rightfully upon the highway as a traveler and become a trespasser when he uses the highway for any other purposes inconsistent with the passing and repassing thereon. And it is quite clear that fishing upon the highway would not come within the rights of the public or the individual to pass and repass over the highway, or incidental to that passing and repassing; and that the defendant Newman and the public at large, while they might be properly upon the highway in passing and repassing thereon, nevertheless would have no right under these decisions to stop and fish upon the highway without permission of the abutting property owner where his title extends to the center of the road. That is to say, on that part of the highway in which the fee is vested in the abutting property owner.

The next question; Is injunction the proper remedy or has the petitioner other remedies which are exclusive and to which he must resort, namely, the criminal statutes of the state applicable thereto or an action in damages for injuries done?

We have at least two criminal statutes which cover a situation of this kind.

Section 12522.

"TRESPASSING UPON LANDS OR PREMISES OF ANOTHER.

"Whoever, being about to enter unlawfully upon the lands or premises of another, is forbidden so to do by the owner or occupant, his agent or servant; or being unlawfully upon the lands or premises of another, is notified to depart therefrom by the owner or occupant, his agent or servant, and thereafter enters upon such lands or premises or neglects or refuses to depart therefrom, shall be fined not less than $1.00 nor more than $5.00."

And as has already been suggested, when one goes onto this property for the purpose of fishing rather than as a traveler on the highway, he becomes a trespasser. Or if he is fishing on the highway he becomes a trespasser on the failure to leave as provided in Section 12522, and could be criminally prosecuted under that section.

Section 12525 provides that

"Whoever trespasses upon lands or rights in lands of another, lying in or bordering upon a natural or artificial pond or brook less than 10 miles in length, into which have been introduced brook trout, speckled trout, brown trout, land lock salmon, California salmon or other fish by artificial propagation or actual importation from other waters, for the purpose of fishing for, catching or killing fish, or catches or kills fish therein, or buys, receives or has in his possession fish caught contrary to the provisions of this section, or wilfully places poison or other substances injurious to the health of such fish in a pond or brook described in this section for the purpose of capturing or harming such fish therein; or wrongfully and wilfully lets the water out of such pond or brook with intent to take or injure fish therein, shall be fined not less than $10.00 nor more than $100.00, and for each subsequent offense shall be fined not less than $25.00 nor more than $200.00; or imprisoned not less than 30 days nor more than 6 months; or both."

Then of course there is the common law action of trespass for damages done, which is a civil proceeding. And if these fish are actually the property of the Water Company and are so far under its domination and control as to vest in it a property right, the taking of the fish would be larceny. I am not passing on that question at this time as to whether the taking of the fish out of this pond under the circumstances would be larceny. If so, one taking the fish could be prosecuted for larceny. A very interesting case

along that line is found in the 67 Ohio State, 157; in the case of *The State of Ohio* v. *Shaw, et al.* The syllabus is as follows:

"To acquire a property right in animals *ferae naturae,* so that they may be the subject of larceny, the pursuer must bring them into his power and control so that he may subject them to his own use at his pleasure, and must so maintain his possession and control as to indicate that he does not intend to abandon them again to the world at large; but in cases where larceny is charged the law does not require absolute security against the possibility of escape.

"When fish are enclosed in a net, or in any other enclosed place, which is private property, from which they may be taken at any time at the pleasure of the owner of the net or enclosure, the taking of them therefrom with felonious intent will be larceny."

So that if the Water Company has such control and domination over these fish as expressed in the above case, they are the sole property of the Water Company and the taking of them would be larceny.

I am not passing on that question at this time. That question could be raised and settled in an indictment for larceny if the fish are taken out of the waters of the reservoir.

So that there are at least three if not four remedies that without doubt could be pursued by the Water Company rather than injunction. But are these exclusive or are there circumstances in the particular case which would justify, under the law, the court granting an injunction restraining the defendant and the public at large from fishing out of the waters of this reservoir, whether the waters be outside of the limits of the highway or within the limits of the highway?

That has been a troublesome phase of this case and I have examined innumerable authorities and have come to a conclusion satisfactory to myself.

Pomeroy, Equity J. P. 4th Edition, Vol. 4, page 3240. In the chapter entitled Injunctions to prevent torts:

"If the trespass is continuous in its nature, if repeated acts of wrong are done or threatened, although each of these acts done by themselves may not be destructive and the legal remedy may therefore be adequate for each single act if it stood alone, then also the entire wrong will be

prevented or stopped by injunction on the ground of avoiding a repetition of similar actions. In both cases the ultimate criterion is the inadequacy of the legal remedy. All the cases, English and American, have professed to adopt the inadequacy of legal remedies as the test of injunction jurisdiction. But in applying this criterion, the modern decisions with some exceptions among the American authorities have certanly held the injury to be irreparable and the legal remedy inadequate in many instances and under circumstances where Chancellor Kent would have refused to interfere. It is certain that many trespasses are now enjoined which if committed would fall far short of destroying property or of rendering its restoration to its original condition impossible. The injunction is granted not merely because the injury is essentially destructive, but because being continuous or repeated, the only compensation for the entire wrong could not be obtained in one action at law for damages. While the same formula is employed by the courts of equity in defending their jurisdiction, the jurisdiction itself has practically been enlarged. Judges have been brought to see and to acknowledge contrary to the opinion held by Chancellor Kent that the common law theory of not interfering with persons until they shall have actually committed a wrong is fundamentally erroneous, and that a remedy which prevents a threatened wrong is in its essential nature better than a remedy which permits the wrong to be done, and then attempts to pay for it by the pecuniary damages which a jury may assess."

And further, Volume 5, page 4335

"The jurisdiction of equity to restrain continued or repeated trespass rests on the ground of avoiding a repetition of similar actions. It is a basis of jurisdiction that is frequently found in cases where the injury is also irreparable. Very often indeed the injury is irreparable only because it is continued or repeated, when it would not be if temporary, and in such cases the injunction will issue as a matter of course."

And further on,

"When the trespasses complained of are caused by the separate acts of indivduals, a multiplicity of suits may be caused to plaintiff either because the defendants are numerous or because a single defendant does the same or similar acts repeatedly. The principle involved in all such cases is the same, and injunctions should issue. And when the basis of the multiplicity of suits which plaintiff fears is that the defendants are numerous, all authorities agree in granting the injunctions."

And further says that the

"Most frequent and best established rationale for injunctive relief against trespasses is that of the multiplicity of suits which would be required to secure redress where a trespass is continuing in its nature, or where a repetition of similar acts is threatened. Though it was the early doctrine supported by an occasional modern case, that multiplicity of suits in this connection imported a plurality of parties, as distinguished from a mere succession of suits between the same parties. The contrary principle seems supported by the great weight of modern authority which holds that under appropriate circumstances, a multiplicity of suits between the same parties for a continuing or recurring injury in the nature of trespass is of itself an irreparable injury. Recurring actions would be more vexatious and expensive than effective. In some cases the inconvenience and annoyance of repeated trespasses, where of a character to interfere with the free use and enjoyment of property, are held sufficient to warrant relief, even though damages be nominal."

And 29 Corpus Juris, 552;

"Injunction may be maintained by the owner of the fee in a proper case to restrain a wrongful use of the highway."

This seems to be the general law on the right to injunctive relief. However, we have some authority in our own state bearing on this issue. And first, as to the right of injunctive relief where there are criminal statutes available. It is the claim of the defendant that these criminal statutes must be pursued exclusively and that injunction is not the proper remedy, but prosecution. And as a general rule, this seems to be the law, but there are some exceptions to the general rule; and does this case come within any of those exceptions?

In the case of *Murphey* v. *Lincoln, et al,* Supreme Court of Vermont, 22 Atlantic Reporter, page 418, the first paragraph of the syllabus is as follows:

"Injunction will lie to prevent continuous trespasses on the land of plaintiff by drawing wood and logs across it where a continuation of the trespasses is threatened, and where defendants claim a right of way over the land the use of which, if permitted, will ripen into an easement."

The case of *Ellis* v. *Wren,* Court of Appeals of Kentucky,

1st Southwestern Reporter, page 440, second syllabus is as follows:

"Injunction will lie, at the suit of a purchaser of land sold by an executor, to restrain the tenant in possession from removing stone therefrom where it appears that, if the writ is denied, there will result a continuing trespass and a multiplicity of suits."

14 Ruling Case Law, page 376, paragraph 78:

"In early times the English Court of Chancery, not without much protest, on the part of the common law courts, occasionally issued injunctions to restrain the commission of certain criminal acts. This jurisdiction seems to have been confined to cases in which other tribunals were too weak to protect the poorer and more helpless classes of the community against the power of the great nobles, and the reasons for exercising it disappeared when the common law courts became fully capable of controlling and repressing such acts of violence and outrage. Accordingly it is now the rule that where acts complained of are violations of the criminal law, courts of equity will not on that ground alone interfere by injunction to prevent their commission, as they will not exercise their powers for the purpose of enforcing the criminal laws by restraining criminal acts. Therefore in absence of proof of pecuniary injury to the complainant or the association, an injunction will not issue at the suit of a stockholder in an incorporated fair association, to restrain the company and its officers from permitting gambling on the grounds for a pecuniary reward, nor has a court of equity jurisidiction to include in a divorce decree, an injunction against remarriage within a specified time, which is by statute a penal offense, so that violation of it can be punished as a contempt."

And paragraph 79:

"The rule stated in the foregoing paragraph does not preclude injunctive relief against the commission of criminal acts in any case where the act sought to be enjoined will operate to cause an irreparable injury to property or rights of a pecuniary nature. The rule in this respect so far as one may be gathered from the decisions which are in considerable conflict is that equity will not interfere to prevent the commission of criminal acts, if the injury which will result to property therefrom is merely a consequence, however natural and inevitable, of such acts; but if the acts, although criminal in the sense that the state has imposed a penalty for their commission, are primarily and essentially

an injury to property, preventive relief may be granted within the same limits and under the same conditions as where the element of criminality is entirely absent, that is, an injunction will not issue unless the damage threatened is irreparable and the evidence clear and convincing. The court in such case, does not interfere to prevent the commission of crime, although that may incidentally result, but it exerts its force to prevent individual property from destruction, and ignores entirely the criminal feature of the act. The fact that a criminal act, which is a continuing injury to property and business, may also be indictable as a crime does not deprive equity of its rights to enjoin its commission."

We are not without some Ohio law bearing on this question. 21 Ohio Jurisprudence, pages 1182, 1183 and 1184, under the subject, Injunctions, paragraph 118.

"The rule is well settled in Ohio, in accord with the general rule elsewhere, that in the absence of any threatened injury to property rights, a court of equity will not interfere by injunction to restrain or prevent the commission of criminal acts or the violation of the penal laws of the state merely upon the ground of the illegality of the threatened act. As is often stated, injunction is not the proper remedy to enforce the penal laws of the state. The rule is enforced whether the injunction is sought by a private party or by the state or one of its political subdivisions. Criminal acts are to be guarded against by other forms of procedure, that is, by prosecution for the enforcement of the penalties and punishment prescribed by the statute. Where a method for the arrest, restraint and punishment of parties who commit or threaten to commit acts of violence toward the person or property of another is provided, there is no propriety in a court of equity stepping in and claiming superior fitness for the discharge of duties which have been specifically entrusted to another tribunal by the Legislature. The rule that equity will not interfere by injunction to prevent a criminal act is applicable when there is a threatened violation of a municipal regulation. Such regulations are to be enforced by the municipality by appropriate penalties prescribed. The mere fact that the officers whose duty it is to enforce the penal laws fail or refuse to act does not require an injunction to issue against a criminal act. And the general rule that equity will not interfere by injunction to prevent an alleged violation of a Sunday law unless some other ground for granting an injunction exists has been applied in Ohio. If, however, the averment of a petition would, if proven,

entitle the plaintiff to an injunction, a writ will not be refused merely because the acts sought to be enjoined are punishable under the criminal statutes, as where some irreparable injury is threatened to property rights."

And paragraph 119:

"Although it is true that injunction is not the proper remedy to enforce the penal laws of the state, the fact that wrongful interference with another's property may constitute a penal offense is no reason for refusing a writ, if the plaintiff for any other reasons is entitled to the same. The proper expression of the rule that equity will not restrain the violation of a penal statute is that equity will not interfere in such cases in the absence of an injury to property rights, or rights of a pecuniary nature. If the act sought to be enjoined is one that will operate to cause irreparable injury to property rights, or rights of a pecuniary nature, injunctive relief may be granted against the commission thereof, although the threatened act may be within the prohibition of the penal statutes and the offender would be subjected to criminal punishment. In other words, injunction may issue to restrain the commission of an act criminal in its nature where the primary object of the injunction is the protection of property rights and interests."

And the author cites as an illustration an injunction which had been granted against the holding of a prize fight, and to restrain the acts of striking workmen punishable by the criminal laws where they tend to the destruction of property. An injunction may also issue to restrain a competitor in business from committing criminal acts which injure complainant's property rights.

In the case of *The Mechanics & Traders Branch of the State Bank of Ohio* v. *Henry Debolt,* 1st Ohio State Reports, 592, part of the syllabus is as follows:

"A court of chancery will not interfere to prevent a mere trespass.

"Where adequate compensation can be had in an action at law, there is no ground to justify the interposition of a court of equity.

"Where the injury threatened would be irreparable, or where, from some pecuniary circumstances connected with the parties or the transaction, complete redress cannot be had at law, a court of chancery is warranted in assuming jurisdiction."

In the case of *Lembeck* v. *Nye, Same* v. *Andrews*, 47 Ohio State, at page 336, a part of the syllabus is as follows:

"A non-navigable inland lake is the subject of private ownership, and where it is so owned, neither the public nor an owner of adjacent lands whose title extends only to the margin thereof, have a right to boat upon or take fish from its waters.

"Where numerous acts are being committed, and their continuance threatened, under a claim, of right by one person on the land of another, which acts constitute trespass and the injury resulting from each act is or would be trifling in amount as compared with the expense of prosecuting actions at law to recover damages therefor, the owner may resort, in the first instance, to a court of equity for appropriate relief.

"The plaintiff in this case sets forth in his petition that he owned in fee simple and was entitled to the exclusive possession of the land that underlies and forms the natural bed of Chippewa Lake in Medina county, Ohio, together with a narrow strip of land that surrounds the same; that the lake was valuable for the purpose of keeping boats and fishing tackle for hire to persons who resort to it for recreation and pleasure; that the defendants, who respectively occupy certain lands that border on the lake, in violation of the rights of the plaintiff, have each fitted out and keep for hire boats and fishing tackle, have let the same to excursionists and pleasure seekers for hire and intend to continue to do so, whereby repeated and constant acts of trespass are being committed and will continue to be committed on his said property by transient, and in many instances irresponsible, persons; that the defendants are each irresponsible pecuniarily, and that the ordinary actions at law would furnish him no adequate remedy. And prays for an injunction and general equitable relief."

And in this case and under this set of facts, the Supreme Court held that a decree should be issued restraining the defendants from letting to hire either boats or fishing tackle to be used on the water overlying the land so found to belong to the plaintiff.

In the case of *State of Ohio, ex rel. Reynolds,* v. *The Capital City Dairy Co., et al.,* 62 Ohio State Reports 123, the syllabus is as follows:

"Injunction will not lie at the suit of an inspector employed by the dairy and food commissioner to compel a manufacturer and seller of an article of food or drink to furnish, for analysis, as provided by Section 4200-7 of

Bates Annotated Statutes, samples of the article manufactured or sold. The remedy for refusal to comply with the requirements of that section is by prosecution under the succeeding section."

However, the court in its opinion on page 126 observes:

"The remedy of the state for infractions of its penal and punitive laws, lies in the proper prosecution for the enforcement of the penalties and punishment prescribed, in the mode provided by statute, except that when such infractions constitute an abuse or misuse of corporate franchises proceedings in *quo warranto* may also be maintained. Nor can the action be maintained as one in behalf of the relator individually; for the statute gives no private remedy of that kind. The rule is well settled that, where there is no threatened injury to personal or property rights, equity will not lend its aid by injunction to restrain the violation of public or penal statutes, or the commission of criminal acts."

In the case of *The Renner Brewing Company* v. *Rolland*, 96 O. S., page 432, the second paragraph of the syllabus is as follows:

"Where the averments of a petition would, if proven, entitle the plaintiff to an injunction, a writ will not be refused merely because the acts sought to be enjoined are punishable under the criminal statutes of this state."

A late pronouncement of our Supreme Court on this question.

And on page 441, the court in the course of its opinion uses this language.

"It is further contended that injunction is not the proper remedy to compel obedience to the penal laws of the state. That of course is true, but the fact that wrongful interference with another's property may constitute a penal offense is no reason for refusing a writ, if the plaintiff for other reasons is entitled to the same."

The case of the *East Bay Sporting Club* v. *Miller, et al*, 118 O. S., page 360, dealing with the subject of fishing, the syllabus is as follows:

"The public has a right of navigation and fishing in the waters of the open bays of Lake Erie, and such rights are not limited within such public bays to the particular portions thereof which are navigable in the legal sense, but such rights of fishing and navigation extend to any portions of such waters so long as they are a part of Lake Erie or its open bays.

"Waters are navigable in law when they are used or are susceptible of being used in their ordinary condition as highways for commerce, over which trade or travel are or may be conducted in the customary modes of travel upon water.

"A water course is a stream usually flowing in a particular direction in a definite channel, having a bed, banks or sides, and discharging into some other stream or body of water. It need not flow continuously, and may sometimes be dry or the volume of such water course may sometimes be augmented by freshets or water backed into it from a lake or bay or other extraordinary causes; but so long as it resumes its flow in a definite course in a recognized channel and between recognized banks, such stream constitutes a water course.

"The owner of land comprising both banks and the bed of a stream or river which is not legally navigable and not a part of Lake Erie or its bays, has the exclusive right of fishing in such waters and may enjoin trespassers from entering upon and fishing therein."

Of course we are all aware of the fact that this stream is not a navigable stream.

A late and carefully considered case is that of *Goodman v. Western Bank and Trust Co.,* 28 Ohio Nisi Prius (New Series), page 272, wherein a petition was filed to restrain the practice of law by a Trust Company. And the court, after a careful consideration held that such a petition was not demurrable. In other words, that it did set forth a cause of action. A part of the syllabus is as follows:

"The admission of an attorney to practice law confers upon him a right, in the nature of a franchise or property right, to engage in his profession without competition from others who are not officers of the court or subject to its discipline and orders, and such attorney is entitled to the same protection as the owner of any other franchise or property right.

"Equity will restrain the commission of acts which cause injury to property rights or rights of a pecuniary nature notwithstanding such acts may also constitute the violation of a penal statute.

"The provisions of Section 1698-1, General Code, prescribing a penalty for practicing law by one not licensed as an attorney do not afford such an adequate legal remedy for the protection of an attorney from lay competition as would prevent the exercise of equitable jurisdiction.

"Equity will protect the right of an attorney, suing on behalf of himself and others similarily situated, to pursue

his profession without lay competition without showing special damages or a special injury to property rights.

"In a suit by an attorney on behalf of himself and others similarly situated to restrain a trust company from practicing law, it is no defense against the exercise of equitable jurisdiction that defendant would be deprived of a jury trial, because the purpose of the proceeding is not to punish the defendant for a violation of Section 1698-1, General Code or any other provision of law."

And it was claimed in this case that equity will not restrain the violation of a penal statute and that the proper proceeding to prevent defendant from engaging in the practice of law is one to enforce the penalty prescribed in Section 1698-1, General Code or by *quo warranto.*

However, the court held differently and on page 277 the court quotes with approval an excerpt taken from the celebrated case *In re Debs,* 158 U. S. 564. Justice Brewer speaking for the entire court said at page 593:

"There must be some interferences, actual or threatened, with property or rights, of a pecuniary nature, but when such interferences appear, the jurisdiction of a court of equity arises and it is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

So that the general rule and the rule in Ohio appears to be that where there is no adequate remedy at law on account of numerous and continuous trespasses requiring a multiplicity of suits, and where the violation is one that will operate to cause irreparable injury to property rights or rights of a pecuniary nature, injunctive relief may be granted against the commission thereof, although the threatened act may be within the prohibition of the penal statutes and the offender subjected to criminal prosecution and in the light of the testimony in the case, it certainly cannot be contended that the right to take fish out of the reservoir by the owners is not a property right and of pecuniary value.

Does this case come within these exceptions? This petitioner owns the title to the land in question to the center of the road. He has under the law the exclusive right to the use of these lands to the center of the highway subject only to the right of the public to travel thereon, repair same and to do those things incidental only to travel. And certainly

fishing in the highway is not incidental to travel, but more in the nature of a diversion, and without doubt a violation of the easement vested in the public.

As a matter of law, the defendant Newman or others have no more right to fish upon this land south of the center of the highway than they would to cross the line fence separating the plaintiff's land from the limits of the highway, and certainly no one contends that an individual or the public have such a legal right to go upon the lands of another and fish, even though the title of the fish are in the public, as such would constitute a trespass. The owner has exclusive right to catch fish on his own land and an individual or the public have no right to interfere with that right without permission of the owner. Fish in the waters flowing over one's land is property which he has the exclusive right to catch. In other words, as expressed by one of our courts, a fishery is a profit in the land, a right to take part of its product, and is termed a profit *a-pendre*. So that the fishing upon the lands of the petitioner is in violation of a property right of a pecuniary nature and, being so, under these holdings of the courts in this state, the petitioner is entitled to the relief prayed for; to-wit, a perpetual injunction prohibiting such trespassing.

The people of the country are becoming more and more jealous of their rights as the years go by, and this is indicated by the various organizations found in the rural life of the country, in which trespassing upon their lands for the purpose of hunting or fishing are prohibited, and certainly it could not be contended that, in the face of these prohibitions, one would have the right to go thereon and hunt or fish.

I am not inclined to believe that the public or the defendant Newman have wilfully, maliciously and purposely violated a known right of the company. No doubt they believed in good faith they had a right to fish within the confines of the highway; and I have spent considerable time and effort to determine the respective rights of these parties, and it is not to be wondered at that the layman could not measure to a nicety his exact rights in such a situation as here presented. Injunction allowed; Exception; Appeal bond $200.00.